```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   UNITED STATES OF AMERICA      )  Case No. 23 CR 546
                                   )
 4          v.                     )
                                   )
 5   ANTHONY MONTGOMERY-WILSON and )
     PRESTON POWELL,               )  Chicago, Illinois
 6                                 )  July 30, 2025
                     Defendants.   )  11:04 a.m.
 7
        TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT ON MOTION TO SEVER
 8             BEFORE THE HONORABLE THOMAS M. DURKIN

 9

     APPEARANCES:
10
     For the Government:    MR. ANDREW S. BOUTROS
11                          INTERIM UNITED STATES ATTORNEY
                            BY:  MR. JASON A. JULIEN
12                               MR. JARED C. JODREY
                            Assistant United States Attorneys
13                          219 S. Dearborn Street, 5th Floor
                            Chicago, Illinois 60604
14

15   For Defendant          KEITH A. SPIELFOGEL LAW OFFICES
     Montgomery-Wilson:     BY:  MR. KEITH A. SPIELFOGEL
16                          190 S. LaSalle Street, Suite 520
                            Chicago, Illinois 60603
17

18                          LAW OFFICE OF DARRYL A. GOLDBERG
                            BY:  MR. DARRYL A. GOLDBERG
19                          33 N. Dearborn Street, Suite 1830
                            Chicago, Illinois 60602
20

21   For Defendant          BLAINE & VANZANT, LLP
     Powell:                BY:  MS. HOLLY N. BLAINE
22                          922 Davis Street
                            Evanston, Illinois 60201
23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For Defendant          LAW OFFICE OF MOLLY ARMOUR
      Powell:                BY:  MS. MOLLY ARMOUR
 3                                MR. MICHAEL PODGURSKI
                             53 W. Jackson Boulevard, Suite 1424
 4                           Chicago, Illinois 60604

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Court Reporter:        ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                             Official Court Reporter
21                           United States District Court
                             219 S. Dearborn Street, Room 1432
22                           Chicago, Illinois 60604
                             312.408.7782
23                           Elia_Carrion@ilnd.uscourts.gov

24                            *   *   *   *   *
                      PROCEEDINGS REPORTED BY STENOTYPE
25         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1          (Proceedings heard in open court; defendants present:)

2          THE CLERK:  This is Case No. 23 CR 546, United States

3     v. Montgomery-Wilson and Powell.

4          May I please ask the attorneys present on behalf of

5     the United States to state their names.

6          MR. JULIEN:  Good morning, Your Honor.  Jason Julien

7     and Jared Jodrey for the United States.

8          THE CLERK:  And for Mr. Montgomery-Wilson.

9          MR. SPIELFOGEL:  Good morning, Your Honor.

10    Keith Spielfogel, and Darryl Goldberg will be here shortly,

11    Your Honor, on behalf of --

12         THE COURT:  Do you want to wait for him?

13         MR. SPIELFOGEL:  No.  I actually spoke to him

14    yesterday and he said that we should begin.

15         THE COURT:  Okay.

16         THE CLERK:  All right.  And for Mr. Powell.

17         MS. BLAINE:  Good morning, Your Honor.  Holly Blaine

18    and Molly Armour and Michael Pod- -- Podgurski on behalf of

19    Mr. Powell.

20         THE COURT:  All right.  And the defendants are both

21    present in court.

22         All right.  There was a motion for severance filed by

23    Defendant Powell, objected to by the government, and then a

24    reply brief was filed in support of severance.  I had -- the

25    government asked for oral argument and that's what we're here

1    today for.

2         So how do you want to proceed?  Have you talked about

3    it?

4         MR. JULIEN:  We haven't.

5         THE COURT:  You haven't.  Okay.

6         MR. JULIEN:  It's their motion, Judge.

7         THE COURT:  It's their motion so they should go first.

8    And happy to hear the argument.

9         MS. ARMOUR:  Thank you, Your Honor.

10        THE COURT:  And you can do it from -- seated or you

11   can come up to the podium, whatever you prefer.

12        MS. ARMOUR:  This is fine, Your Honor.

13        THE COURT:  Okay.

14        MS. ARMOUR:  So to begin, we believe that it is not

15   possible to admit the alleged statement of

16   Mr. Montgomery-Wilson and to have Mr. Powell be in the same

17   trial or face that evidence without the ability to

18   cross-examine him.  That would -- would result, undoubtedly, in

19   a trial that would not be fair to Mr. Powell.  We have advanced

20   a number of different bases that we believe support our request

21   for severance in this matter.

22        We, of course, begin with the confrontation clause and

23   the Sixth Amendment right that that guarantees.  It is our

24   belief and our position that the government's perspective on

25   the admissibility of this statement would basically --

5

1    essentially gut the protections that the confrontation clause

2    afford it.

3           If this exception is allowed to proceed in this case,

4    it would essentially swallow the entire right, the exception

5    would swallow the right because there will -- and this is

6    our -- our best guess, that Mr. Powell, undoubtedly, not be

7    able to cross-examine the purported maker of that statement, he

8    will be unable to effectively challenge this evidence in front

9    of the jury and will effect -- effectively have to sit silently

10   by while the -- while this evidence is admitted.

11          THE COURT:  Yeah, you won't know if you can

12   cross-examine literally until the defense case.  I mean, the

13   odds are most defendants don't testify, but we don't know.

14   Every defendant has a right to, but your point is at a joint

15   trial you would hope he testifies so you can cross-examine him.

16   If he doesn't, the only person you can cross-examine would be

17   the person who made the tape.

18          MS. ARMOUR:  That is correct.  And by that point in a

19   trial what we are challenged by if we waited until the point of

20   a defense case is that statement would've already been admitted

21   by the government, and that is a bell that cannot be unrung.

22   It is overwhelmingly prejudicial.

23          THE COURT:  Mr. Spielfogel, can you guarantee your

24   client's going to testify at trial?

25          MR. SPIELFOGEL:  Absolutely not, Judge.

1          THE COURT:  Okay.  Make sure you're in front of a mic.

2          MR. SPIELFOGEL:  Oh, I'm sorry.

3          Certainly not, Judge.

4          THE COURT:  All right.  Go ahead.

5          MS. ARMOUR:  Because of such, this evidence would be

6    admitted against Mr. Powell.  I think the government, you know,

7    spends -- spent a lot of time in its response setting forth the

8    evidence that they believe was elucidated and comparing it to

9    other points of evidence, but nevertheless, it's -- it -- this

10   is not a statement where Mr. Powell is not referenced.  The

11   nickname Marley is referenced repeatedly in this statement.

12         Perhaps we would be facing a different scenario had

13   the codefendant never been mentioned, had a name never been

14   uttered.  But nevertheless, by doing that, by implicating him

15   in this incredibly serious offense, he spreads the blame.  He

16   shares the blame for what occurred with Mr. Powell, and he

17   draws him in to that -- to -- to his statement in that regard.

18         And, you know, we do not believe that the case law

19   with regard to the confrontation clause is nearly as

20   straightforward as the government believes.  And, you know, we

21   don't need to -- to, you know, relitigate everything that we

22   set forth in our reply and in our opening motion that highlight

23   the various issues that we think are there.

24         Number one, the issue of whether or not the statement

25   is testimonial.  We don't believe that is.  That's far from

1    settled law.  And even if it was a testimonial statement, we

2    don't believe that's dispositive.  We --

3          THE COURT:  Why?  Give me the reasons why it's not

4    dispositive if it is testimonial.

5          MS. ARMOUR:  Because -- and -- and that relies on the

6    Supreme Court's own statements that -- that testimonial is not

7    the end of the analysis, that they -- the cases that were

8    presented before the Court that we have available to us to

9    analyze this issue explicitly say this -- we are not intending

10   to issue this opinion excluding all other potentialities.  We

11   are only addressing the facts of these cases, and there are

12   potential -- you know, paraphrasing -- there are potential

13   other scenarios in which, you know, a nontestimonial statement

14   could present an issue under the same constitutional issue.

15         So that's why we believe that even if it is dispo- --

16   if -- even if it is testimonial, it is not dispositive of the

17   issue, and that is not a settled issue before the

18   Supreme Court, and they took great pains to explain that they

19   were not making a declarative statement that only testimonial

20   statements were what was at issue.  They say it is a primary

21   concern, but they explicitly said it is not the sole concern of

22   the Sixth Amendment.

23         THE COURT:  How does the *Lilly* case support your

24   position?

25         MS. ARMOUR:  Well, the *Lilly* case talks about

1    really -- really I think supports it because they challenge so

2    much the inherent unreliability of a statement such as this

3    being admitted and they go through a number of different

4    scenarios of potential statements but admitted against someone

5    who is not the maker of the statement.  And it is highly

6    unlikely, *Lilly* says, that such evidence could be effectively

7    rebutted if admitted.

8            And I think that, you know, it -- as to evidence that

9    is used to establish the guilt of an alleged accomplice, that

10   that is one of the categories that they are most concerned of,

11   and that's what we're dealing with here.  And as we talked

12   about, you know, the Seventh Circuit's very bare bones analyses

13   in different contexts of the *Lilly* case, the *Lilly* case

14   actually went out of its way to express great concern about

15   reliability here.

16           And we also believe that the statement was not

17   reliable.  And we can't effectively challenge that reliability

18   because the maker we fully expect not to testify, and some of

19   those reasons are the facts surrounding the making of the

20   statement are very different from some of those Seventh Circuit

21   cases interpreting *Lilly*.

22           Number one here, the statement, the alleged statement,

23   was not made to a coconspirator as it was in *Watson*, as it was

24   in *Volpendesto*.  In this case, it is to basically a government

25   agent, a government informant, that has been wired up with the

1    purpose of obtaining this statement.  And in that --

2             THE COURT:  Was the person who recorded the statement

3    an inmate who -- or was it an actual third party, not an

4    inmate, brought in specifically for this purpose?  Do you know?

5             MS. ARMOUR:  We -- we fully believe it is an inmate of

6    the institution that the government recruited.

7             THE COURT:  Okay.

8             MS. ARMOUR:  But the government can speak most adept

9    to those facts.

10            THE COURT:  Well, address that when you come up.

11            But go ahead.

12            MS. ARMOUR:  So unlike in *Watson* or unlike in

13   *Volpendesto*, the statements were not made to someone who was a

14   part of this case, who you would expect to share secret

15   confidences with in the same kind of manner.  *Watson* involved a

16   coconspirator who was also in a romantic relationship with the

17   maker of the statement.  And those two layered factors would

18   tend to lend some level of reliability to the statement.

19   You're speaking to some -- a loved one and you're speaking to

20   someone who's part and parcel of the crime.

21            As for *Volpendesto*, that person was a coconspirator.

22   So that was someone who was also involved in the underlying

23   offense itself.

24            This -- in this case, this statement was made I

25   believe over a year after the shooting and murder occurred, and

1    it was made to someone shortly after Mr. Montgomery-Wilson

2    arrived at this institution, an institution that at the time

3    that he arrived there had a very well-known reputation for

4    violence and for danger, and we documented some of that in our

5    opening brief.  And I think as physically evident and as we

6    related from the discovery materials we have, with all respect

7    to Mr. Montgomery-Wilson, he's a relatively small individual.

8    And coming into a new penal institution serving an Illinois

9    Department of Corrections sentence, it is absolutely a normal

10   thing to create luster, to try and create some sort of

11   reputation that protects you safely and --

12              THE COURT:  Wouldn't --

13              MS. ARMOUR:  -- engenders people to protect you.

14              THE COURT:  -- wouldn't that involve his own conduct

15   rather than another person's, though?  If he's trying to boast,

16   talk about, you know, being a killer, why involve a third

17   person -- a second person?  Why not just talk about his own

18   activities?

19              MS. ARMOUR:  That's a question I would love to be able

20   to ask to Mr. Montgomery-Wilson, but again, that's not

21   something that we're going to be able to challenge or confront

22   or parse out with him.  I -- you know, I -- some of that may go

23   to street reputation.  I can't speak to what was in his mind or

24   how -- why he involved him, but I think that it is clear that

25   he did.  And that spreading of the blame I think puts us

1   squarely, again, within the kinds of concern that the

2   Supreme Court raised when we deal with a statement like this,

3   which should be treated as inherently unreliable precisely

4   because he is bringing someone else into it.

5          So whether we look at it from the context of the

6   confrontation clause and spreading the blame or if we look at

7   it -- it from another context of, you know, well, why was he

8   able to make any -- that kind of statement, in either way,

9   Mr. Powell is hamstrung in an ability to challenge that

10  evidence if it is admitted.

11         THE COURT:  Assuming I -- if I were to find it to be

12  testimonial, what is the basis to keep it out otherwise?  Well,

13  let me ask a different question.  I -- from what I saw, I don't

14  know how this can be redacted without a jury assuming it's the

15  codefendant who's named there, but maybe this is more for the

16  government when you get up, but I -- you know, typically in

17  cases like this, sometimes there's a redaction.  I don't know

18  why there -- how that would work here.  We're not -- I've

19  already said we're not going to do two juries.  It's either

20  a -- one trial with two defendants or two trials with one

21  defendant each, but we're not going to do two juries.  It's

22  just not workable I think the way we've got things set up here.

23         Is there a basis to redact this in any way without --

24  where -- and would the government even want to redact it?

25  Again, you can answer that.  But is there a basis to redact it

1   where your client is not implicated if you take out his

2   nickname and just include nothing but Mr. Montgomery-Wilson's

3   statements where he implicates himself?

4         MS. ARMOUR:  I think in this case no.  Perhaps if we

5   were sitting at trial with six other potential codefendants and

6   there might be a question of who the alleged maker of that

7   statement is, that might be a different scenario.  Those are

8   not the facts we have here.  There will be two defendants if

9   this trial's unsevered sitting at counsel table.  And the

10  jury -- and the government's entire theory of the case will be

11  presented, two shooters will appear on their surveillance

12  video.  There is only one answer as to who else was present

13  that day, and the jury will only answer that as Mr. Powell.  So

14  I -- I believe that answer is no.

15        THE COURT:  All right.  So, again, if I find it to be

16  testimonial, we're past confrontation clause, maybe, but what

17  is the other basis by which I could deny the -- or grant the

18  motion to sever?

19        MS. ARMOUR:  So we do believe under the rules of

20  severance themselves, and we outline that in our opening

21  motion, as well as addressing a little bit in our reply, permit

22  this Court to sever, and, you know, some of that analysis is

23  based on the lack of reliability.  But fundamentally, the rules

24  on joinder and severance allow this Court to consider the

25  context of the whole, and if it is unfair and has, you know,

1    basically appears, I believe is the phraseology that is

2    specifically in the severance rule in Rule 14, to prejudice

3    either party, it should not -- you know, that is a basis for

4    severance.

5          THE COURT:  And I'd like the government to address

6    that --

7          MS. ARMOUR:  And that's at page 5.

8          THE COURT:  -- because there's a lot of back and forth

9    about whether this is testimonial or not, and certainly, it's a

10   statement against interest by Mr. Montgomery-William --

11   Mr. Montgomery-Wilson, but there's no question it's a statement

12   against his interest.  He's saying on tape he killed the guy.

13   But the real question is, in my mind, at least, is under

14   Rule 14 where it's a pretty broad issue of prejudice to a

15   defendant.

16         And again, you'll get your chance, but something to

17   address.

18         Go ahead.

19         MS. ARMOUR:  So -- and -- and this is something in our

20   opening motion, you know, we spent most of our time addressing

21   the confrontation clause issues, but we reference the

22   guarantees of -- of due process, which incorporates

23   fundamentally the right to a fair trial.

24         And we address that more in our reply, and I -- the

25   appears to prejudice language that comes from the -- the -- I'm

1    sorry -- the Rule 14, the severance rule, for us, that

2    prejudice is clear and apparent.  It would -- it would clearly

3    appear to touch upon Mr. Powell's right to a fair trial, and

4    that prejudice is enormous.

5         I also just want to take a moment just to highlight

6    that given all of the -- and we -- we talked about this in our

7    reply, but given all the evidence that the government has

8    outlined in its motion, we think the prejudice for, you know,

9    granting severance, or in the alternative, excluding the

10   statement against the government is minimal because they went

11   through and outlined all of this evidence that they would have

12   absent the statement to prove their case.

13        On the other hand, the prejudice to Mr. Powell is

14   overwhelming.  There is just no way for this statement to come

15   in against him and not have the jury understand and fully

16   believe that that relates to Mr. Powell and there is no way to

17   effectively rebut that evidence.

18        We -- we cited a -- a quotation about just

19   the importance of cross-examination and elucidating the truth.

20   And that tool, that tool to somehow level the playing field

21   against this prejudicial evidence is not something that we will

22   have available.  And so in analyzing what the -- a prejudice is

23   here, we think the prejudice is great to Mr. Powell and the

24   prejudice to the government is minimal.

25        And then, finally, if the Court finds that it cannot

1    sever this case, and we do believe that the Court has broad

2    discretion to -- to sever, if the Court does not believe that

3    that is an appropriate remedy or that it cannot sever, there is

4    still Rule 403, which allows for the exclusion of the evidence,

5    and we believe that that would be appropriate if severance is

6    not.

7         And that would essentially -- and given all the

8    evidence the government has set forth ably, we believe that

9    there -- the prejudice to the government would be minimal, the

10   probative value of the evidence minimal, again in light of the

11   other evidence that is available in this case to the

12   government.  And again, the prejudice to Mr. Powell is

13   extraordinary.

14        THE COURT:  All right.  Thank you.

15        Your point is if you're going to try it -- I take it

16   you have no objection to a joint trial if the tape's not

17   played.

18        MS. ARMOUR:  Correct.

19        THE COURT:  Okay.  Because they're properly joined as

20   defendants, at least under Rule 8.

21        MS. ARMOUR:  We would agree with that.

22        THE COURT:  Okay.  Anything else?

23        MS. ARMOUR:  No, Your Honor.

24        THE COURT:  Okay.  Anything that counsel for

25   Mr. Montgomery-Wilson wants to add?

1    MR. SPIELFOGEL:  We have nothing to add to that,

2  Your Honor.

3    THE COURT:  Okay.  I'll hear from the government.

4    MR. JULIEN:  There a couple of things.  I just want to

5  address your questions before I -- I get going --

6    THE COURT:  Sure.

7    MR. JULIEN:  -- in -- in responding to the arguments.

8    The informant was an inmate in IDOC.  He hadn't been

9  in that specific facility for a long time.  He was brought into

10  that facility and then moved out of that facility, but had been

11  in IDOC generally within --

12    THE COURT:  Okay.

13    MR. JULIEN:  -- the system for a while.

14    THE COURT:  Is he expected to be a witness at trial --

15    MR. JULIEN:  He will be.

16    THE COURT:  -- to authenticate the tape?

17    MR. JULIEN:  Well, I guess it depends.  If -- if we

18  are talking about the tape's in and he's got to come in and

19  provide some -- you know, authenticate --

20    THE COURT:  Sure.

21    MR. JULIEN:  -- what happened, then yes, we would be

22  calling him.

23    Certainly, in a trial against Mr. Montgomery-Wilson,

24  we were planning to call him.  So their position would be in a

25  trial against Mr. Powell, we wouldn't call him because he's

1   really just talking about the recording, but we plan to call

2   him.

3            THE COURT:  Okay.

4            MR. JULIEN:  The other -- to your point about

5   redacting the recording, we would like the opportunity,

6   depending on what the ruling is, to assess, you know, how we

7   would do that, and if we would do that, what that would look

8   like.  It may be the case that it's possible to redact a

9   recording.  He's talking about Mr. Montgomery-Wilson and a

10  number of individuals on the recording.  And certainly, when

11  he's talking about, you know, the crux of the murder itself,

12  he's really only talking about Mr. Powell, but he's talking

13  about another act of violence that he committed days prior that

14  we think is relevant to Count 3, the felon-in-possession

15  charge.

16           THE COURT:  Was Mr. Powell involved in that one?

17           MR. JULIEN:  No --

18           THE COURT:  Okay.

19           MR. JULIEN:  -- he was not.

20           He's talking about Mr. Powell having the inside source

21  and Mr. Powell getting a call from another individual in terms

22  of payment itself.  And I'm sure you've heard the recording or

23  read the transcript.  He's talking about a number of

24  individuals.  So it's not like, on the recording, the parts

25  that are relevant to the trial he's only talking about

1　Mr. Powell.  But, again, certainly, when he's talking about

2　from 2:22 p.m. to about three o'clock, he's just talking about

3　him and Mr. Powell and the individual who he committed that

4　prior act of violence with who was on the phone and he said

5　wanted to --

6　　　　　THE COURT:  Well, if the jury heard -- and this

7　follows up on this -- if the jury heard the tape saying, yeah,

8　I -- I -- I was going to shoot the victim and I told, blank,

9　you know, beep, to watch the guard, there's only two defendants

10　sitting in court.  I think a jury would reasonably conclude the

11　beep relates to the other defendant.

12　　　　　MR. JULIEN:  You could -- again, assuming that this is

13　where we land, you could offer a limiting instruction as well,

14　assuming that you rule that the evidence couldn't be admitted

15　against Mr. Powell, that, hey, members of the jury, what you're

16　about to hear would only be admissible against

17　Mr. Montgomery-Wilson, assuming we go down that path.

18　　　　　THE COURT:  Are these natural life -- mandatory

19　natural life --

20　　　　　MR. JULIEN:  They are.

21　　　　　THE COURT:  Yeah, I'm -- I know limiting instructions

22　are, not to state a pun, but they're -- have limited utility.

23　I mean, we -- we give them, we expect the jury to listen to

24　them.  In a case where the penalty is a mandatory natural life,

25　telling a jury to ignore something that's right in front of

1   them is like saying ignore the elephant in the room.

2        I -- I -- I think there's limited utility to a

3   limiting instruction in a criminal case where -- in a situation

4   like this.  So I -- I understand, and it happens a lot where

5   you admit a relatively discrete piece of evidence, but this

6   tape if it -- I haven't listened to the tape, I just read the

7   transcripts, but I'm assuming it's pretty powerful as to

8   Mr. Montgomery-Wilson.  And with two defendants in the

9   courtroom, it's going to be really hard for a jury not to

10  understand the person that is beeped out is the other guy

11  sitting in the courtroom.

12       MR. JULIEN:  And I understand that that's what we

13  want.  I'm just -- I'm -- I'm addressing your -- your

14  question --

15       THE COURT:  Understood.

16       MR. JULIEN:  -- that we would want to assess what the

17  ruling is --

18       THE COURT:  Sure.

19       MR. JULIEN:  -- and we can talk about what our options

20  are and hopefully --

21       THE COURT:  Another question before you get to the

22  substance, and there's a few here I have.  How long would this

23  trial be with both defendants?  How long would the trial be

24  with each defendant separately?

25       MR. JULIEN:  I think it's the same length, Your Honor.

1    So I think it only increases calling one additional witness,

2    the informant, and playing the relevant portions of the

3    recording in a trial against Mr. Montgomery-Wilson.  And that

4    was a two-week estimate.  And so a trial against Mr. Powell is

5    just -- that evidence is removed, but it's otherwise the same

6    presentation.

7            THE COURT:  In light of my other trial schedules,

8    that's nothing, a two-week trial.  If you're saying another --

9    and two two-month trials, that would be a lot of time, but two

10   weeks whether that tape -- two weeks for one defendant, two

11   weeks for the other, or two weeks joint.

12           MR. JULIEN:  Correct.

13           THE COURT:  So -- okay.  Got it.  Go ahead.

14           MR. JULIEN:  So unless you have any other questions, I

15   would like to respond to -- to some of the arguments.

16           Your Honor, I think the fundamental problem -- there

17   are actually two fundamental problems with Mr. Powell's

18   position and arguments here is an overreliance on the *Lilly*

19   case.  So *Crawford* was decided and changed what the analysis

20   is.  So we're not talking about the reliability and all of

21   those things in terms of confrontation clause.  *Crawford* says,

22   is it testimonial or is it not testimonial?  Illustrate some

23   examples of what are testimonial, and it makes it clear that

24   that is an objective standard.

25           And the cases that we cite, the Seventh Circuit cases,

1    three in particular, *Watson*, *Davis v. Washington*, and the

2    *Volpendesto* case, all also make that clear.  We're not talking

3    about the subjective state of mind in Mr. Montgomery making

4    these -- the statement or the subjective state of mind of the

5    informant making the recording.  It's objectively when you look

6    at this, is the declarant making statements that are

7    testimonial, that, you know, would be used in trial.  And what

8    *Watson*, *Washington*, and *Volpendesto* all say is that a statement

9    that's made unwittingly, unknowingly to a coconspirator in what

10   looks like a casual conversation, that's not testimonial.  And

11   that's the example that we have here.  As I said, there are two

12   fundamental problems.  That's one.

13        The second relatedly is I think Powell has

14   characterized what has happened here as an interrogation, which

15   is what was at issue in *Lilly, Crawford*.  But post-*Crawford*,

16   they haven't cited to you a case at -- and I think we've cited

17   to you a couple that support our position where in jail and

18   persons talking to a fellow inmate said -- or coconspirator,

19   what used to be a coconspirator, says something what's clearly

20   not a police interrogation and that that would be an

21   interrogation just because the person is an informant.

22        What we're talking about here between

23   Mr. Montgomery-Wilson talking to this informant, this is not an

24   interrogation.  There's -- Mr. Montgomery-Wilson wouldn't have

25   said these things to him had he, you know, been in the

1     interrogation room.

2               THE COURT:  No, of course not, right.

3               MR. JULIEN:  He's saying these things against

4     interest, against his own interest because he doesn't think

5     that these things are going to be used against him at trial.

6     He would think --

7               THE COURT:  Well, wouldn't the question -- the point

8     raised by defense is that he's saying it to enhance his

9     reputation for violence and then protect himself in jail.  You

10    know, whether that's far-fetched or true, isn't that something

11    that the -- only a cross-examination of Mr. Montgomery-Wilson

12    would reveal?

13              MR. JULIEN:  I think that that goes to the difference

14    between *Lilly* and what happened in *Crawford* and post-*Crawford*

15    in terms of the subjective state of mind of the declarant.

16              Now, I'll just say as a point of fact, Judge,

17    Mr. Montgomery-Wilson and this informant are both gang members.

18    You mentioned you haven't heard the recording, but when you

19    listen to it, this is an intense, you know, chest-pounding

20    conversation.  These guys are laughing, cracking jokes.  It's a

21    freewheeling conversation because they're familiar with each

22    other.  They know some of the same people.  This isn't, you

23    know, jailhouse puffery, I'm trying to intimidate him.  It's

24    hey, they're reminiscing.  And let me tell you about this

25    thing, let me tell you about this thing, let me tell you

1   about -- oh, let me tell you about this murder that we

2   committed -- right? -- in addition to another act of violence

3   that I committed the day before.

4         So I -- I -- I think getting into what's in

5   Montgomery-Wilson's state of mind is not an area that we should

6   be in based on the case law, which says you have to kind of

7   look at this objectively, not subjectively.  But, again, just

8   as a point of fact, that's not what's happening when you listen

9   to this recording, Your Honor.

10        And so --

11        THE COURT:  No, I need -- I need to listen to it,

12  you're correct.

13        MR. JULIEN:  Yeah.  The cases that we cite, I just

14  gave you those three, I think are directly on point.  And so

15  one thing I want to underscore, and this is in -- I think in

16  the initial brief of Mr. Powell and the reply is this idea that

17  what *Washington, Davis* -- *Washington*, *Watson*, and *Volpendesto*

18  are not saying is that a statement is only not testimonial if

19  the person is a coconspirator.  Because in those cases, the

20  person is not a coconspirator at the point where they're

21  recording --

22        THE COURT:  Right.

23        MR. JULIEN:  -- on --

24        THE COURT:  Conspiracy was over.

25        MR. JULIEN:  Right.  Precisely.

1     So we think these cases are on point.  We think

2  they're factually analogous to what happened here.  We have not

3  located a case post-*Crawford* or post-*Watson*, which is 2008,

4  where the Seventh Circuit has said that the jailhouse

5  conversation, which is incriminating and incriminates another

6  person, is impermissible because it happens in that -- in that

7  scenario.

8     The defense, Mr. Powell, hasn't pointed Your Honor to

9  one, and we've been talking about this for a while, I think we

10  came in May when we talked about this briefing, so we think

11  we're on solid legal footing here in saying that these cases

12  and the analysis in these cases are what you should be looking

13  at in terms of whether this statement is testimonial or not.

14     THE COURT:  Let's assume it's testimonial, you know,

15  you may have the better argument under the case law, at least,

16  I think it's a statement against interest, of course.  No

17  rational person would make these statements, and the indicia of

18  reliability typically attaches the statements against interest,

19  especially when they're way against interest, like describing

20  how a person was executed.

21     Have you found cases that -- well, first, is it an

22  abuse of discretion standard on a Rule 14 grant and have you

23  found cases where a judge has abused this discretion by

24  granting a severance under Rule 14 where were I to do it under

25  these circumstances, there's a case out there saying what you

1    did is contrary to U.S. v. X?

2         MR. JULIEN: So no, we haven't found a case that

3    said -- well, so let me back up. It's an abuse of discretion

4    standard --

5         THE COURT: Right.

6         MR. JULIEN: -- and we have not found a case where it

7    would say it's an abuse of your discretion to -- to grant

8    severance.

9         On this point, though, there is one thing I want to

10    just -- on the fundamental fairness issue, and I just -- I use

11    this as a -- kind of an illustration. It's not the same thing,

12    but I think the idea that the statement shouldn't come in or

13    confession shouldn't come in just because Mr. Powell can't put

14    Mr. Montgomery-Wilson up on the stand and cross-examine him, I

15    think it's analogous to the situation where statements are

16    being offered that were made in furtherance of a conspiracy

17    under Rule 801, and that's not what this is. That's not the

18    basis that we're offering it, but it's the same idea.

19         You know, coconspirator makes a statement that's

20    incriminating and maybe it's a codefendant and you can't put

21    him on the stand and cross-examine him, but the statement still

22    comes in if it was made in furtherance of the conspiracy.

23         We have statements like that, not -- not the

24    confession, but in this case, the text messages back and forth

25    about the payment, we would offer those as statements in

1   furtherance of the conspiracy.  So Mr. Montgomery-Wilson can't

2   put Mr. Powell on the stand and cross-examine him when he was

3   talking about payment from Individual A in the text, but that's

4   certainly relevant and it goes to the crux of what we're

5   talking about here.

6           So just because --

7           THE COURT:  Well, but the -- the timing difference is

8   important, though, because --

9           MR. JULIEN:  Sure.

10          THE COURT:  -- statements during a conspiracy, whether

11  you get to cross-examine the maker of the statement or not, are

12  something well-recognized as an exception to the hearsay rule

13  under 801(d)(2)(E).  But if you look at the Advisory Committee

14  Notes to Rule 14 all the way back to the 1966 amendment, it's

15  talking almost exactly like an -- about a situation like this.

16  And maybe it's -- well, go ahead.

17          MR. JULIEN:  Yeah.  So I -- just closing the loop on

18  that point, Your Honor, all I'm pointing out is the idea -- if

19  the basis is solely I can't cross-examine this person because

20  they said something that is incriminating to me, there -- I use

21  that as an analog.

22          THE COURT:  Okay.

23          MR. JULIEN:  I mean, just -- so on the Rule 14 joinder

24  severance, Your Honor, this crime was committed together and

25  there's lots of overlapping evidence, separate and apart from

1    the confession, so -- which I think is why the length of the

2    trial is going to be the same.

3           So text messages, you know, we're talking about both

4    defendants, and that's coming in I think in a trial against

5    both of them.  The DNA, physical evidence, the scene, the

6    victim who survived, the security guard, is going to have to

7    come and testify at both trials.  Cell tower evidence, all of

8    these things are coming in I think at both trials, and the

9    reason why is because they committed this crime together.

10          THE COURT:  Would you be willing to try the case

11   without the tape, try -- try the two defendants together

12   without the tape?

13          MR. JULIEN:  So, Your Honor, I -- I think the tape has

14   to come in and it's just a question of, you know, can we -- and

15   this is one of the things we want to assess depending on what

16   the ruling is, can we redact it or not, will we want to redact

17   it or not.  Even if we say we will redact it, will you -- do

18   you think that a limiting instruction is a sufficient safeguard

19   for the jury?  I think we want to talk about that depending on

20   what your ruling is.  But I think in a trial against

21   Mr. Montgomery-Wilson at the very least, we want this recording

22   and we want to use it.

23          Now --

24          THE COURT:  All right.

25          MR. JULIEN:  -- one thing that Ms. Armour said in

1    talking about all of the other evidence that we have -- and we

2    do have a lot of evidence and we think it corroborates the

3    recording, but this is a singular piece of evidence in the

4    sense that we don't have another example, other than the text

5    messages, of a defendant acknowledging he committed the murder.

6    And -- and not only that he did it, but why he did it, which

7    provides color to the text messages and everything they did

8    that day.

9          So this is -- I mean, we can put the case on and we'll

10    prove our case, I think, in addition to this recording, but

11    this is not -- you know, it's not a situation where, which I

12    think Ms. Armour was suggesting, we have all of this other

13    evidence and so it's unduly prejudicial because you don't need

14    it because you got all this other stuff.

15          THE COURT:  What is your other evidence on Powell if

16    the tape is out?

17          MR. JULIEN:  So the physical evidence.  We have his

18    DNA on -- fingerprint on the cup.  We have the video.  We have

19    cell site.  We have text messages from him that we're going to

20    say -- argue support our view of that other evidence.  You

21    know, they're together.  Their cell site evidence puts them

22    together at a residence or at an area that's consistent with

23    being at Powell's residence, traveling in tandem over to the

24    site of the murder, sitting in that parking lot, you know,

25    departing after the murder, all of these things, physical

1    evidence, we think would be evidence against Mr. Powell.

2            THE COURT:  Is anyone going to identify him as being

3    on that tape?  Is the face clear enough?

4            MR. JULIEN:  I don't think so, Your Honor, and it's

5    one of those things we're just going to have to argue in

6    closing, but they're wearing masks, so no one's going to come

7    in and say --

8            THE COURT:  Oh, all right.

9            MR. JULIEN:  -- that's Mr. Powell.

10           THE COURT:  I couldn't tell they were wearing masks so

11   that probably speaks to the issue of could anyone identify

12   their face anyway.

13           MR. JULIEN:  Yeah.

14           THE COURT:  Who was supposed to collect the money?

15   Was it Powell?

16           MR. JULIEN:  So that's what they're talking about in

17   the text messages.  I think what the evidence will show -- and

18   this is one of the reasons why we want to introduce the

19   reported -- Mr. Montgomery-Wilson makes it clear that he was

20   going to collect the money from Individual A and Mr. Powell was

21   hounding him about it.  Has he given you the money?

22           THE COURT:  Okay.  Okay.  All right.  Well, I --

23   anything else?

24           MR. JULIEN:  Nothing else, Your Honor.

25           THE COURT:  Okay.  Any response?

1          MS. ARMOUR:  Just briefly.

2          Just taking a -- a couple of the points that the

3     government hit.  Regarding the timing of *Lilly* versus *Crawford*,

4     and we set this forth in our -- our reply and I believe also in

5     our opening brief, but *Crawford* explicitly says regarding the

6     testimonial point, the Sixth Amendment is not solely concerned

7     with testimonial hearsay, period.  Full stop.  And that's at

8     541 U.S. 30 -- 36 at page 53.

9          And then at page 69 of *Crawford*, it -- in it -- the

10    majority opinion says -- and says repeatedly throughout the

11    opinion that they are not providing, quote, a comprehensive

12    definition of testimonial -- of what testimonial is.  And I

13    think that's important for that -- just to answer that context.

14         We have *Lilly*, which speaks to this other issue.  But

15    if you're going to say that *Crawford* subsumes *Lilly* and somehow

16    *Lilly* is not relevant or good law anymore, nevertheless,

17    *Crawford* on its own basis says testimonial is not the end-all

18    be-all of this analysis, and nor are they trying to set forth

19    what is testimonial and what is not testimonial.  They are

20    providing what we would say are minimal boundaries outlining

21    certain categories that they firmly believe are testimonial,

22    but they are not ruling out what is not testimonial.

23         With regard to the point about *Volpendesto* and *Watson*

24    that the conspiracy is over at that point, our point is not

25    that it somehow met, you know, a coconspirator -- coconspirator

1    exception, but that the fact that they were confederates, the

2    fact that they were mutually engaged in the criminal activity

3    is the relevant factual point.  So we -- we just wanted to

4    highlight that.

5            And then with regard to the analogy made to the

6    coconspirator exception -- and I understand that that's, you

7    know, just an analogy, I think the -- there could not be two

8    different exceptions to hearsay.  In the coconspirator

9    exception, and as Your Honor points out and the government

10   acknowledges, there is this component that is -- creates this

11   reliability, which is the in furtherance component, and that is

12   something that the use of this particular exception to hearsay,

13   the use against the statement against interest, *Lilly* talks

14   extensively whether it -- and we believe it remains good law --

15   but talks extensively about the history behind and the concerns

16   behind the inherent unreliability to those kinds of statements

17   as applied to a third party, not the maker.  And so I -- I

18   just -- while I appreciate the attempt to find an analogy, I

19   just -- I do not think that it is -- it's appropriate.  It's --

20   it's as applied in this case.

21           And then, you know, I think -- I think what's

22   important here is, like, of course this is not a, you know,

23   traditional interrogation, but it certainly is an interrogation

24   within like a plain meaning of the understanding, which is the

25   government's agent, this inmate, was in fact trying to elicit

1    information and questioning to illicit the information.

2         So this is not just a passive hearing.  This is not

3    just Mr., you know, Montgomery-Wilson being wired up in his

4    cell and just speaking to himself.  These statements were

5    elicited.  And there is a government component to the eliciting

6    of this statement that I think cannot be lost.

7         And for all the reasons that we outlined previously,

8    we do believe that the prejudice is extraordinary, that there

9    is no remedy, limiting instruction, cross-examination, no

10   remedy that could be given in this case that would erase the

11   taint from the jury's mind of hearing a statement like this

12   with Mr. Powell sitting at the table and not automatically

13   assign the blame to him.

14        THE COURT:  All right.  Thank you.

15        MR. JODREY:  Your Honor, just one -- one just quick

16   thing --

17        THE COURT:  Sure, Mr. Jodrey, go ahead.

18        MR. JODREY:  On this -- keeps coming back to *Lilly*.  I

19   just -- I just want to highlight one thing.  *Lilly* dealt with

20   police interrogations, so they're talking about reliability.

21   In addition to *Crawford* saying we're not going there anymore,

22   we're just doing it as a testimonial or not, *Lilly* dealt with a

23   police interrogation.

24        The crux of this testimonial issue, as the

25   Supreme Court and the Seventh Circuit has said, is was it made

1  under the circumstances that would lead a witness to believe

2  that what I'm saying is going to be used in court.  Right?

3  That's -- that's what that's about.  And there's a reason when

4  you look at the defendant's reply brief, they basically ask

5  this Court to, like, overturn *Watson*, right?

6        They're like *Watson* -- Seventh Circuit got it wrong in

7  *Watson*.  That's not what this Court's role is, right?  Like,

8  *Watson* says:  A statement unwittingly made to a confidential

9  informant and recorded by the government is not testimonial for

10 confrontation clause purposes.

11       That's exactly what we have here.  And that's why they

12 have to say, well, Judge, we disagree with *Watson*.  That's

13 the -- that's the circuit law on this, and so it -- it is

14 clearly not testimonial.  And so the second question, then, is,

15 does it fall under a different -- if it's an out-of-court

16 statement -- right? -- does it come under the -- the statement

17 against interest?  This Court has just said, clearly it comes

18 in as a statement against interest.  That's where the

19 reliability comes in.  People don't admit to committing

20 homicides they didn't commit.  That's where the reliability

21 comes in with respect to what he's saying, and that's where the

22 corroboration comes in.  And they say, well, there's almost too

23 much corroboration.

24       Well, that -- they're conceding the other factor in

25 considering whether is this -- this kind of goes to the

1  fairness issue -- is it reliable?  Yes.  People wouldn't say

2  this if it weren't true.  He's implicating himself in a

3  homicide.  And what he's saying is corroborate up and down as

4  being true.

5       And just like Mr. Julien said, this idea that they're

6  essentially putting forward, which is, well, if I can't

7  cross-examine him, therefore it's unfair.  Evidence -- evidence

8  against coconspirators and codefendants get admitted without

9  the ability to cross-examine all the time.  So that -- that

10 can't be the thing just because they can't cross-examine him.

11 All -- it's not testimonial, so *Crawford* doesn't apply.  It

12 clearly is a statement against interest, so it's a -- it falls

13 under a hearsay exception, right?  So the only question is, is

14 it somehow unfairly prejudicial?  And it's not unfairly

15 prejudicial.  It is a statement that is admissible.

16      THE COURT:  Well, we still -- you, not we, you still

17 have to deal with Rule 14, which gives me the ability, if I

18 believe it's appropriate, if the joinder of offenses in an

19 indictment -- I'm paraphrasing -- appears to prejudice a

20 defendant, the Court may order separate trials of counts, sever

21 the defendants' trials.

22      And I -- you know, I think the -- you both raise good

23 arguments about whether it's testimonial or not and what the

24 effect of various -- of *Watson* and other cases is, but,

25 ultimately, if -- if we go on down a decision tree and find

1   that it's testimonial and can be admitted as a statement

2   against interest, is there anything that prevents me under

3   Rule 14 if I believe that it would be -- prejudice a defendant

4   if that's -- if you want to admit that statement to sever the

5   defendants?

6           And, you know, the rule allows me to do it, but -- and

7   it's an abuse of discretion standard.  Are there cases where a

8   judge grants the severance, under these circumstances or

9   anything analogous, where presumably the government has to take

10  an appeal at the time, take an interlocutory appeal or a

11  mandamus of some kind to get that issue resolved, which is why

12  there's probably not a lot of case law out there?  Is there

13  anything out there that if I determine a severance is

14  appropriate under Rule 14 that I'm acting -- I'm abusing my

15  discretion?

16          MR. JODREY:  I -- I -- I -- like you said, I'm not

17  aware of a case on -- on that point.  But I would just note in

18  *Watson* -- and I can't pronounce the name right, *Volpendesto* --

19  I mean, essentially, that's the argument is like, hey, this

20  shouldn't have come in, these defendants if it were --

21  right? --  it wasn't raised in that context given the way it

22  played out -- right? -- but the Court was essentially being

23  question -- asked, like, hey, this shouldn't have come in.

24          And the courts and the Seventh Circuit, when this

25  question has come up, have been, yeah, no, it absolutely should

1    go in.  It was admissible.  So it's -- it's the reverse end of

2    what you're talking about.  And so is it prejudicial?  Sure.

3    But is it unfairly prejudicial?  No.

4         And when it comes to the joinder or severance issues,

5    like, would this evidence be admissible against Mr. Powell in a

6    separate trial?  And we -- our -- we would say yes.  Under the

7    Rules of Evidence, I mean, this is a statement that is coming

8    in as a clear well established hearsay exception.  And again,

9    just because you can't cross-examine him, that's not the

10   end-all be-all here.

11        The analogy again is just like that happens a lot in a

12   different -- when we talk about, you know, Santiago and things

13   coming in, it's -- it's coming in under a different rule, but

14   the idea -- the -- the sort of the fairness argument that's

15   being made here applies, which is like, well, that seems unfair

16   I can't -- I can't cross-examine -- I mean, in -- in

17   coconspirator statements, sometimes you don't even know who the

18   declarant is and it still comes in, so long as the government

19   can establish that the statements made by someone who's a part

20   of the conspiracy.

21        So even in cases where not only can I not

22   cross-examine the person, I don't even know who the person is.

23   It's just a statement made as part of the conspiracy.  That's

24   essentially the argument.  This is unfair because I can't

25   cross-examine him, right?  It's not -- I mean, like -- again,

1   that kind of goes back to the -- the rationale for the hearsay

2   exception.  Is it reliable?  And it is.

3           THE COURT:  Well -- okay.  Okay.

4           Well, I will listen to the tape, which I should before

5   I make a ruling on the case.  My preliminary thinking, though,

6   is that I would grant a severance under Rule 14.  I -- I do

7   believe, absent my rereading the briefs, rereading the cases,

8   and listening to the tape, as opposed to just reading the

9   transcript, that the joinder of the offenses would appear to

10  prejudice the defendant.

11          The Advisory Committee notes talks about a situation

12  just like this, even though it's an old Advisory Committee

13  note.  If the government -- if that will get you started on

14  whether you're going to redact it so you can play it at a joint

15  trial, I'd work on that and provide me with the -- at least the

16  transcript, probably easier than cutting and pasting a tape --

17  or clipping the tape, but a transcript of how you would admit

18  it in a joint trial where it wouldn't prejudice Mr. Powell,

19  keeping in mind he's the only guy sitting there with -- with

20  Mr. Montgomery-Wilson.  And that's what we'll do.  But

21  that's -- if -- if -- that's my preliminary thoughts.

22          And I -- I can't get past the idea that I view this as

23  unfairly prejudicial to Powell in a -- and if you were to offer

24  that tape in a joint -- in a severed trial against Powell, I

25  would likely not let it in.  Certainly let it in as to

1   Montgomery-Wilson.  He's the guy on the tape.  There's no

2   question, of course, it comes in as to him.  But if I sever the

3   case and you attempted to put that in, which you should, you

4   attempt to, but I would likely not allow it in in Mr. Powell's

5   trial, which is the reason I'm granting the -- likely granting

6   the severance, or preliminarily granting it.

7          So if you -- I recognize, Mr. Jodrey, the -- couple of

8   those cases are kind of the flip of the question of whether it

9   could have been admitted in a joint trial if there's any --

10  unlikely event, but if there's any Rule 14 analysis that is out

11  there that either side can point to for me, I'm happy to look

12  at it.  That's really what I'm confronting, a Rule 14 question.

13         But I think the question of whether it's testimonial

14  or not is a close enough question where I don't have to get

15  into that as much as looking at Rule 14, which I think is the

16  ultimate rule dealing with the prejudice to a defendant, which

17  is what I'm required to analyze in determining whether it's

18  allowed in in a joint trial.

19         Okay.  Did we ever set a trial date in this case?  I

20  thought I did.

21         MR. JULIEN:  We did, Your Honor.  I think it's just as

22  to Mr. Montgomery-Wilson, July 6th of next year, 2026.  Or is

23  it the 13th?  I think it's July --

24         MS. ARMOUR:  I believe it's July 6th.  And I believe

25  that defense counsel for Mr. Montgomery-Wilson had a slight

1    conflict with that date, so I believe that was actually set as

2    to Mr. Powell.  I could be wrong.

3               MR. SPIELFOGEL:  I don't believe we set which client

4    would be going to trial first.

5               THE COURT:  There is a trial on July 6th.

6               MR. JULIEN:  There is a trial date, and time is

7    excluded through July 6th of next year.

8               THE COURT:  To both defendants, because there hasn't

9    been a severance.

10              MR. SPIELFOGEL:  Correct.

11              THE COURT:  Okay.  All right.  Then you'll need a

12   ruling from me.  I'd start working on the redaction, if that's

13   your intent to offer it in a single trial.

14              MR. JODREY:  Will do.

15              THE COURT:  And your anticipation whether it's a

16   single trial or a joint trial is two weeks?

17              MR. JODREY:  That's correct.

18              THE COURT:  Okay.

19              All right.  Very good.  Anything else from the

20   government?

21              MR. JULIEN:  Yes, Your Honor.  Just in terms of

22   process, and we know you have some -- some obligations this

23   fall --

24              THE COURT:  Yeah.

25              MR. JULIEN:  -- we think it would still be wise to get

1    back in here maybe next month, sooner rather than later, just

2    given, you know, trial calendars.  It sounds like maybe there's

3    an issue with the July 6th date, and I think it's better to

4    know that sooner --

5              THE COURT:  Okay.

6              MR. JULIEN:  -- rather than later, depending on what

7    your ruling is.  If there are going to be two trials, to put

8    those dates on the calendar.  So would it make sense to come in

9    before your trialapalooza kicks off next --

10             THE COURT:  Yeah, that starts September 4th.  So maybe

11   a -- Emily, the third week of August if we have time.

12             In court with defendants present, I assume.

13             MR. SPIELFOGEL:  That would be fine, Your Honor.

14             THE CLERK:  Just taking a look here.

15             MS. ARMOUR:  Yes.  Ms. Blaine is unavailable, but I am

16   during the third week, which is that -- the week of the 18th?

17             THE COURT:  Yeah.  I think --

18             MR. GOLDBERG:  Your Honor, may I --

19             THE COURT:  Make sure you're in front of a mic, Mr. --

20             MR. GOLDBERG:  May I suggest the first half of that

21   week, if possible?

22             THE COURT:  Yeah.  And there's nothing magic about

23   that week, but -- what's that, the week of August 18th, or are

24   we talking -- yeah, I'm out at the Seventh Circuit conference

25   which we're supposed to attend is the first two days.

1          Or how about August 25th, that week?  Is that better

2     for everyone?

3          MR. JULIEN:  Works for the government.

4          MR. SPIELFOGEL:  That's fine, Your Honor.

5          THE COURT:  How about for --

6          MS. ARMOUR:  I -- I am -- I am out of the office and

7     Ms. Blaine has a sentencing that day.

8          THE COURT:  Oh, I meant that week.

9          MS. BLAINE:  I could do the later half of that week.

10    The first part of that week is pretty packed.

11         THE COURT:  How's the 28th?

12         MR. SPIELFOGEL:  And I have a sentencing on the 28th,

13    Your Honor.

14         THE COURT:  What time?

15         MR. SPIELFOGEL:  Oh, actually, you know what, that

16    sentencing's been moved.  Never mind.

17         THE COURT:  Okay.

18         MR. GOLDBERG:  Your -- Your Honor, I -- I have a

19    conflict on the 28th in the morning, but the afternoon is

20    available, and any other day that week works for me.

21         THE COURT:  Let's go off the record.

22       (Off the record.)

23         THE COURT:  Back on the record.

24         Emily, what date can we then set it for?

25         THE CLERK:  August 28th at 2:00 p.m.

1          THE COURT:  Okay.  And defendants will appear.

2          You want your clients here, correct?

3          MR. SPIELFOGEL:  Yes, Your Honor.

4          MS. ARMOUR:  Yes.

5          THE COURT:  Okay.  We'll have the defendants ordered

6    up to come in at two o'clock that day.

7          If you don't have a written ruling by that day, I'll

8    certainly give you an oral ruling, or at least something before

9    the 28th -- or on the 28th.

10         Okay.  Very good.  Then that'll be it.

11         Anything else from the government?

12         MR. JULIEN:  No, Your Honor.

13         THE COURT:  Defense?

14         MS. ARMOUR:  No.

15         MR. SPIELFOGEL:  No, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         MULTIPLE SPEAKERS:  Thank you.

18         THE COURT:  And we don't need the -- I have one

19   question for the attorneys.  Defendants don't need to be here.

20      (Defendants exit.)

21         THE COURT:  We're off the record.

22      (Off the record.)

23      (Concluded at 11:56 a.m.)

24

25

43

1                              *   *   *   *   *

2          I certify that the foregoing is a correct transcript of

3     the record of proceedings in the above-entitled matter.

4

5     /s/ Elia E. Carrión                    1st of September, 2025

6     Elia E. Carrión, CSR, RPR, CRR, CRC
      Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25