UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )   23 CR 546-2 |
| v. | ) |
| | )   Judge Thomas M. Durkin |
| PRESTON POWELL, | ) |
| also known as "Marley" | ) |

**GOVERNMENT'S MOTION *IN LIMINE* TO
ADMIT CO-DEFENDANT STATEMENTS**

## I.   INTRODUCTION

On January 27, 2022, defendant Preston Powell, who is also known as "Marley," and his co-defendant Anthony Montgomery-Wilson, who is also known as "A.J.," killed Stephon Mack, who was also known as "Youngin," outside the Youth Peace Center of Roseland to collect a cash payment for his murder.

In October 2023, Powell and Montgomery-Wilson were charged by indictment with using a facility of interstate commerce with the intent that a murder-for-hire be committed and that a death did result, in violation of 18 U.S.C. § 1958, and conspiring with each other to use a facility of interstate commerce with the intent that a murder-for-hire be committed and that death did result, in violation of 18 U.S.C. § 1958. Dkt. 1. In August 2025, the Court granted Powell's motion to sever his trial from Montgomery-Wilson's trial. Dkt. 128. Powell's trial is scheduled to commence on August 3, 2026. Dkt. 131. In anticipation of trial, for the reasons discussed below, the government moves *in limine* to admit at Powell's trial recorded statements that

1

Montgomery-Wilson unwittingly made to a confidential informant implicating them both in Mack's murder.

## II.    FACTUAL BACKGROUND

### A.    Murder of Stephon Mack

The Youth Peace Center is located at 420 West 111th Street in Chicago. The Youth Peace Center is a "non-for-profit organization offering youth related workshops that mentor teens and teach youth the skills necessary to avoid conflict and violence."[1] At the time of his death, Mack was enrolled as a participant at the Youth Peace Center. Mack was also on federal supervised release following a conviction for having been a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

Based on records obtained from the Youth Peace Center, as well as witness interviews, Mack arrived at the Youth Peace Center just after noon on January 27, 2022, to meet with his mentor and attend a class. As reflected in the Youth Peace Center's video surveillance footage, at approximately 2:22 p.m., Montgomery-Wilson and Powell pulled into the Youth Peace Center parking lot in a 2014 black Chrysler 300 sedan with tinted windows, which had been stolen on or about January 20, 2022. The Chrysler 300 was initially parked on the east side of the parking lot, facing the Youth Peace Center. At approximately 2:25 p.m., the Chrysler 300 moved to the west

---

[1] https://www.youthpeacecenter.org/ (last accessed on November 19, 2025).

side of the lot, facing eastward. The shooters remained in the car waiting for Mack to come outside.



*Screenshot from video surveillance footage depicting*
*the shooters' Chrysler 300 in the Youth Peace Center parking lot*

At approximately 2:59 p.m., Mack exited the Youth Peace Center and began walking across the parking lot toward his car. As he did so, Mack looked over at the Chrysler. Before Mack reached his car, Montgomery-Wilson and Powell emerged from the Chrysler—Montgomery-Wilson from the driver-side door and Powell from the front-passenger-side door—and began shooting at Mack.



*Screenshot from video surveillance footage depicting*
*Montgomery-Wilson and Powell shooting Mack*

3

Mack fled eastbound away from the shooters. Montgomery-Wilson pursued Mack on foot. After crossing the parking lot, Montgomery-Wilson shot at Mack from a distance. Mack eventually collapsed on the other side of the nearby train tracks. Montgomery-Wilson ran over to Mack, stood over him, and executed him. Surveillance video footage depicting what transpired is attached as Exhibit 1 and Exhibit 2.

 

*Screenshot from video surveillance footage depicting Montgomery-Wilson pursuing Mack across the parking lot (left) and over to the train tracks (right)*

After killing Mack, Montgomery-Wilson fled southbound on foot. Ring camera footage from a nearby residence captured Montgomery-Wilson running toward 111th Street. As he passed by the residence at approximately 3:01 p.m., Montgomery-Wilson yelled, "Marley! Come on!" The video recording is attached as Exhibit 3.



*Screenshot from video surveillance footage depicting Montgomery-Wilson fleeing from the scene of Mack's murder*

Video surveillance footage from a community center located at 342 West 111th Street then captured Montgomery-Wilson walking eastbound on 111th Street. At approximately 3:03 p.m., video surveillance footage from a nearby residence captured an individual in the backyard of a vacant residence located at 318 West 111th Street. Minutes later, that same individual appeared to cross over to the south side of 111th Street and head westbound. Later that afternoon, police recovered the Ruger AR-556 used in Mack's murder in the backyard of the vacant residence.



*Map reflecting location of the*
*Youth Peace Center, Mack's body, and Rugar AR-556 recovery*

As Montgomery-Wilson chased down Mack, the Youth Peace Center's security guard stepped into the parking lot. Powell shot him in the left leg. The security guard fell back into the Youth Peace Center, and Powell fled westbound on foot. Surveillance video footage depicting Powell fleeing from the scene is attached as Exhibit 4.



*Screenshot from video surveillance footage depicting*
*Powell firing at the security guard (left) and then fleeing from the scene on foot (right)*

After Montgomery-Wilson and Powell fled, law enforcement searched the abandoned Chrysler 300. Inside the car, law enforcement recovered Montgomery-Wilson's cell phone. A search of the Combined DNA Index System, known as CODIS, revealed that Montgomery-Wilson may be the donor of DNA recovered from the phone. The Illinois State Police Laboratory Report is attached as Exhibit 5. Law enforcement also recovered a coffee cup in the Chrysler 300 that had Powell's fingerprints on it. The Illinois State Police Laboratory Report is attached as Exhibit 6.



*Photograph of the cell phone and coffee cup*
*recovered from the shooters' Chrysler 300*

6

During his recorded conversation with the CS, Montgomery-Wilson told the CS that they killed Mack to collect a bounty that had been put out for Mack's murder by Individual A, who is associated with the music label "Only the Family," also known as "OTF."

On February 19, 2022, Montgomery-Wilson was arrested by the Illinois State Police for possession of a stolen car. In connection with his arrest, law enforcement seized and subsequently searched his new cell phone, which had been activated on or about February 2, 2022 (approximately six days after Mack was murdered). On February 10, 2022, Montgomery-Wilson had a text message exchange with Powell, whose number was saved under the name "Marley2," about collecting the payment from "otf" on February 17:

| POWELL: | Wassup with otf |
| MONTGOMERY-WILSON: | Nothing |
| POWELL: | Wym they not payin |
| MONTGOMERY-WILSON: | We waiting he comes up here on the 17th |
| POWELL: | Ight |

Montgomery-Wilson's text message exchange with Powell is attached as Exhibit 7.

On February 17, 2022, Individual A was in Chicago conducting a podcast interview that was later posted to YouTube. Text messages and video recordings recovered from Montgomery-Wilson's cell phone reflect that he was present for the interview. For example, in the early morning hours of February 18, Montgomery-Wilson had the following text message exchanges with the users of phone numbers ending in 8942 and 1838:

| 8942 Phone: | Ina car wyd |
|---|---|
| MONTGOMERY-WILSON: | At this interview shit |
| 8942 Phone: | Shatttttt You got itttt |
| MONTGOMERY-WILSON: | Not that type interview it's the lil shit the rapper be doing |
| | .... |
| 8942 Phone: | They interviewing [Individual A]? |
| MONTGOMERY-WILSON: | Yeah |

| 1838 Phone: | Wyd |
|---|---|
| MONTGOMERY-WILSON: | At this lil interview shit |
| 1838 Phone: | For a job |
| MONTGOMERY-WILSON: | The shit the rapper be doing |
| 1838 Phone: | What |
| MONTGOMERY-WILSON: | [Individual A] had an interview |

The text message exchanges are attached as Exhibit 8. That day, Powell texted Montgomery-Wilson: "Stand on that why u with [Individual A] nem." Montgomery-Wilson did not respond. On February 18, Powell texted Montgomery-Wilson: "Did [Individual A] gave u that money." Montgomery-Wilson did not respond. *See* Exhibit 7. The following day, Montgomery-Wilson was arrested by the Illinois State Police.

On March 2, 2022, a Facebook story was uploaded to Montgomery-Wilson's Facebook account that depicted Montgomery-Wilson holding money while one of Individual A's songs played in the background and lyrics from the song were displayed over Montgomery-Wilson and the money. Montgomery-Wilson's Facebook story is attached as Exhibit 9.

**B.      Montgomery-Wilson's Recorded Statements to the CS**

On January 6, 2023, Montgomery-Wilson was convicted of being a felon in possession of a firearm (19 CR 1258201) and possession of a stolen motor vehicle (22 CR 497701) in the Circuit Court of Cook County, Illinois, and sentenced to four years' imprisonment. While he was in IDOC custody, the FBI arranged to have another IDOC inmate (the CS) share a cell with Montgomery-Wilson for the purpose of recording their conversations. The pertinent excerpt from the recording is attached as Exhibit B to Powell's severance motion. Dkt. 111.

Montgomery-Wilson told the CS that he killed Mack, whom he referred to by Mack's nickname "Youngin," to collect a bounty that had been put out for Mack's murder. *See*, *e.g.*, Dkt. 111 at 2:20–5:28; 6:44–7:54; 19:00–20:16; 21:25–22:30. Montgomery-Wilson explained that a member of the Risky Road street gang was "the inside source" who located Mack and was in phone contact with Powell, whom he referred by to Powell's nickname "Marley," on the day of Mack's murder. Phone records reflect that, on the afternoon of the shooting, Powell was in phone contact with a suspected member of the Risky Road street gang who was present at the Youth Peace Center that day.

In the course of discussing the murder, Montgomery-Wilson told the CS that he had shot another victim four days earlier using "the AR" and the "same car":

> But Youngin' an older motherfucker. So, he was in a little
> program for feds, shorty. So, whole time he going out, he
> don't really be talking to motherfuckers, you know what
> I'm saying? But shorty and them end up knowing who we

9

> was and put they homie on point. And they put Marley on point, so I just—on Mike—I had just dropped Lil Fred off. You feel what I'm saying? I just dropped Lil Fred off.
>
> Remind you, probably four days ago, this the same car that I used to fuck dude up, that I was just telling you at Johnson. At a—I mean, at Englewood on Sixty-Third, right across from Murda's crib, ni**a. With the AR.

Dkt. 111 at 13:24–14:04.

On January 22, 2022, two individuals ambushed Victim 1 outside Urban Prep Academy's Englewood Campus, located near the intersection of South Princeton Avenue and West 63rd Street. Victim 1, who survived the shooting but was subsequently killed in August 2022, reported that prior to the shooting, he had been watching a basketball game at Urban Prep Academy. After he left the game, Victim 1 observed the two shooters get out of a black Chrysler 300 that had been waiting for him in the parking lot. The Chicago Police Department's Case Supplementary Report is attached as Exhibit 10. An examination of the shell casings from the shooting of Victim 1 on January 22 established that they were fired from the same Ruger AR-556 that Montgomery-Wilson used to kill Mack on January 27.

During the jail recording, Montgomery-Wilson explained that he picked Powell up before the shooting:

> But they man—man, call Marley—Marley got the inside source, on [unintelligible]. I call Marley, "Man, where you at?" "Man, I'm at the crib on 103rd." On Mike, I'm a grab you. Even though I ain't never did shit with him before, I don't heard of him getting wild. He ain't never—he ain't got no [unintelligible] or nothing. He done got some attempts.

10

> You feel what I'm saying? Little fluky shit. But he don't
> really be getting wild.

Dkt. 111 at 14:28–14:56.

Cell site records reflect that Powell's phone and Montgomery-Wilson's phone used cell towers in the vicinity of Powell's residence, respectively, at around 2:00 p.m. and 2:05 p.m. on the day of the shooting. Powell's phone and Montgomery-Wilson's phone then used cell towers located in the vicinity of the Youth Peace Center between around 2:15 p.m. and 2:22 p.m. As discussed above, Montgomery-Wilson and Powell entered the Youth Peace Center parking lot at around 2:22 p.m. Montgomery-Wilson's phone remained at that location until it was recovered by law enforcement following the shooting. Powell's phone was not abandoned; instead, minutes after the shooting, Powell called Montgomery-Wilson's phone, which had been left behind in the abandoned Chrysler.

During the jail recording, Montgomery-Wilson described pulling into the Youth Peace Center parking lot with Powell and waiting for Mack to come outside:

> I told—on Mike—we pulled up, ni**a, his homie calling his
> [unintelligible]—his homie and [unintelligible] we pull up
> to the lot. They tell us—man, there's an armed security
> guard. I'm cool. On Mike, I tell Marley, ni**a, you ain't got
> to do shit, ni**a. Keep the security guard off us, ni**a, on
> my dead niece. Don't—you ain't got to do shit, ni**a.
> Keep—make sure the security guard stay in his place,
> shorty. Keep an eye on the security guard, ni**a.
>
> We pulled up, ni**a—on Mike—we waited right there, like
> twenty minutes, ni**a. I'm on Facetime video with Lil
> Fred, and they man, "Keep us on Facetime. I wanna hear

11

> the shots. I wanna hear this shit." Ni**a ain't even
> supposed to made it that far, ni**a. Only reason he made
> it that far, folk—I had that big ass gun, and I couldn't—I
> really don't wanna be trying to shoot from no distance. I'm
> trying to really get on top of you.

Dkt. 111 at 15:58–16:39. At that point, the CS interrupted Montgomery-Wilson to ask

what kind of gun he used. Montgomery-Wilson said he used an "ARP" (Dkt. 111 at

16:40–16:54)—an AR pistol—after which they had the following exchange:

| MONTGOMERY-WILSON: | Yeah, I had the standard, folk. With a sixty round in that bitch, on Mike. Let three shots out. When he first came out, Marley said to me, "Wait until he gets to his car." Your ass tweaking. By the time he gets to his car, that's enough time to get a pipe. |
| --- | --- |
| CS: | Scratch off, anything. |
| MONTGOMERY-WILSON: | Man, I'll whoo soon as he makes it halfway out in between our car and his car. Busts door down. He already was on the car when he first came out the door. |
| CS: | He on y'all car? |
| MONTGOMERY-WILSON: | He was on our car when he first came out the door. He look. We behind tint. Car running. It's quiet, though. It's a 300. I'm like, throw the door. Doom-doom-doom. I swing that bitch towards the door 'cause there's a ni**a—his lil mentor dude came out with him. I ain't even shoot at him. I just made him run back in. By this time, Marley tossing him down. |
| CS: | The mentor dude? |
| MONTGOMERY-WILSON: | Huh? |
| CS: | The mentor dude? |
| MONTGOMERY-WILSON: | No, he tossing Youngin' down. He tossing him down, shorty. |

Dkt. 111 at 16:54–17:48. As discussed above, the Youth Peace Center's video

surveillance footage shows that as he walked across the parking lot, Mack looked over

12

at the shooters' Chrysler 300. Mack's mentor at the Youth Peace center was standing

by the door. When the shooting began, Mack's mentor ran back inside.

During the jail recording, Montgomery-Wilson then described how he chased

down and killed Mack:

> I chase him. On Mike, as I'm chasing him, shorty, I brace
> up in the field—let off four, five shots. He never fell. On
> Mike, he never fell. So, I'm like—I don't think I hit him.
> You get what I'm saying? . . . He steady running, though.
> You feel what I'm saying? He hit, though. You can tell he
> hit, due to the fact, shorty. You know, you get to losing
> breath. You get to slowing down. On Mike, he got a distance
> on me. . . . On Mike, I'm on his ass. He fell. And he, on Mike,
> he try to go across the tracks. Fall, ni**a. He fall, you
> know? Ni**a be scared. He fumbling and getting up. He
> finally get up, on Mike. He running. On my dead niece, last
> time I see that ni**a's face, his eyeballs was this big, ni**a.
> I'm here, bitch. Come here. You know you ain't
> getting back up after—pow, pow, pow, pow, pow. Right
> over—pow, pow. Head shot. Come here. I'm gone.

Dkt. 111 at 17:51–18:47.

## III.  ARGUMENT

Montgomery-Wilson's recorded statements are admissible against Powell

under Federal Rule of Evidence 804(b)(3)'s hearsay exception as statements against

the declarant's interests.

### A.  Montgomery-Wilson's Statements Do Not Implicate The Confrontation Clause Because They Were Not Testimonial

As an initial matter, in the course of granting Powell's severance motion, the

Court found that the statements Montgomery-Wilson made to the CS during the

jailhouse recording were not testimonial. Dkt. 128. Given that the statements were not testimonial, their admission does not implicate the Confrontation Clause.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the admission of a witness's "testimonial statement" unless that witness is unavailable to testify at trial and the defendant has a prior opportunity to cross examine the witness. *Crawford*, 541 U.S. at 68. That is because the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id*. at 51.

The crux of a "testimonial statement is that it is 'made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial.'" *United Stated v. Watson*, 525 F.3d 583 (7th Cir. 2008) (quoting *Crawford*, 541 U.S. at 52); *see also Brown v. Epps*, 686 F.3d 281, 287–88 (5th Cir. 2012) ("[S]tatements unknowingly made to an undercover officer, confidential informant, or cooperating witness are not testimonial in nature because the statements 'are not made under circumstances which would lead an objective witness to reasonably believe that the statements would be available for later use at trial.' Many other Circuits have come to the same conclusion, and none disagree."). When discussing Mack's murder with his cellmate, Montgomery-Wilson did not believe that his statements would be available for later use at a trial. Instead,

14

the statements were unwittingly made to a confidential informant. As the Seventh Circuit has made clear, a "statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes." *Watson*, 525 F.3d at 583.

### B. Montgomery-Wilson's Statements Are Admissible Under Rule 804(b)(3) As Statements Against The Declarant's Interests

"Hearsay evidence … is generally inadmissible because it is not sworn testimony, its admission prevents juries from evaluating the speaker's credibility, and the opposing party cannot cross-examine the speaker." *Watson*, 525 F.3d at 586. "One of the many exceptions to the hearsay rule, however, applies to statements against the declarant's interest." *Id*. Montgomery-Wilson's statements are admissible against Powell as statements against the declarant's interests, pursuant to Federal Rule of Evidence Rule 804(b)(3).

Rule 804(b)(3) provides for the admission of hearsay statements that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) if offered in a criminal case as one that tends to expose the declarant to criminal liability, is supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it.

15

"Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994); *see also Watson*, 525 F.3d at 586 ("Most people would not say that they knocked over a bank, spit on a policeman, or shoved their mother if it wasn't true.").

As the Court recognized at the oral argument that was held on Powell's severance motion, Montgomery-Wilson's recorded statements were clearly against his interests. During Montgomery-Wilson's recorded conversation with his cellmate, Montgomery-Wilson detailed his involvement in Mack's murder. *See, e.g.*, *United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) ("[T]he context in which Mr. Hamilton made his extrajudicial statements has been recognized by the advisory committee as one that passes Rule 804(b)(3) muster. This is not a case in which Mr. Hamilton made his statements to gain favor with law enforcement officials; rather, he made them to a cellmate with whom he was on friendly terms, and with whom he discussed his legal strategy at length."). Montgomery-Wilson's incriminating statements were not only against his own interests but also replete with tightly woven references to Powell's inculpating role in the shooting.

Montgomery-Wilson's incriminating statements are supported by "corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence

16

that supports or undermines it." Fed. R. Evid. 804(b)(3). Montgomery-Wilson provided a detailed breakdown—at times, a play-by-play narrative—of how he and Powell murdered Mack. During the recorded conversation with his cellmate, Montgomery-Wilson referred to Powell by his nickname "Marley"—the same nickname that Montgomery-Wilson used when looking for his partner right after he killed Mack. As reflected in the examples below, Montgomery-Wilson's incriminating statements were corroborated by other independent evidence.

| Montgomery-Wilson's Incriminating Statements | Corroborating Facts and Evidence |
| --- | --- |
| But Youngin' an older motherfucker. So, he was in a little program for feds, shorty. | Mack was enrolled at the Youth Peace Center while on federal supervised release. |
| And they put Marley on point, so I just—on Mike—I had just dropped Lil Fred off. You feel what I'm saying? I just dropped Lil Fred off. | "Lil Fred" was saved as a contact in Montgomery-Wilson's phone. The Cellebrite extraction report reflecting the "Lil Fred" contact in Montgomery-Wilson's phone is attached as Exhibit 11. |
| Remind you, probably four days ago, this the same car that I used to fuck dude up, that I was just telling you at Johnson. At a—I mean, at Englewood on Sixty-Third, right across from Murda's crib, ni**a. With the AR. | Approximately five days before Mack's murder, two masked men got out of a black Chrysler 300 sedan—the same color, make, and model as the car used by Mack's killers—near the intersection of South Princeton Avenue and West 63rd Street in Englewood and shot Victim 1 with the same AR-556 that was used to kill Mack. License Plate Reader records reflect that the Chrysler 300 was located approximately two miles away from the scene of the shooting about 10–15 minutes before it began. The LPR report is attached as Exhibit 12. |
| But they man—man, call Marley—Marley got the inside source, on [unintelligible]. I call Marley, "Man, where you at?" "Man, I'm at the crib on 103rd." On Mike, I'm a grab you. | Cell site records reflect that Powell's phone and Montgomery-Wilson's phone were located in the vicinity of Powell's residence on East 104th Street, respectively, at approximately 2:00 p.m. and 2:05 p.m. on the day of the shooting, after which their phones proceeded to use cell towers |

| | |
|---|---|
| | consistent with traveling together to the Youth Peace Center. |
| I told—on Mike—we pulled up, ni**a, his homie calling his [unintelligible]—his homie and [unintelligible] we pull up to the lot. They tell us—man, there's an armed security guard. | Toll records reflect that, as the shooters pulled into the Youth Peace Center parking lot at approximately 2:22 p.m., Powell was in phone contact with a suspected member of the Risky Road street gang who was present at the Youth Peace Center that day. At that time, Powell's phone used a cell tower located in the vicinity of the Youth Peace Center. The Youth Peace had an armed security guard. |
| On Mike, I tell Marley, ni**a, you ain't got to do shit, ni**a. Keep the security guard off us, ni**a, on my dead niece. Don't—you ain't got to do shit, ni**a. Keep—make sure the security guard stay in his place, shorty. Keep an eye on the security guard, ni**a. | The shooter who got out of the front-passenger seat of the Chrysler shot the Youth Peace Center's security guard. |
| Ni**a ain't even supposed to made it that far, ni**a. Only reason he made it that far, folk—I had that big ass gun, and I couldn't—I really don't wanna be trying to shoot from no distance. I'm trying to really get on top of you. . . . I had an ARP, shorty. | The shooter who got out of the driver's seat of the Chrysler used an AR-556 to kill Mack. |
| Let three shots out. When he first came out, Marley said to me, "Wait until he gets to his car." Your ass tweaking. By the time he gets to his car, that's enough time to get a pipe. | The Youth Peace Center's video surveillance footage shows that Mack was initially shot as he walked across the parking lot to his car. |
| He was on our car when he first came out the door. He look. We behind tint. Car running. It's quiet, though. It's a 300. | The Youth Peace Center's video surveillance footage shows that Mack repeatedly looked over in the direction of at the shooters' Chrysler 300, which had tinted windows, as he walked across the parking lot to his car. |
| I swing that bitch towards the door 'cause there's a ni**a—his lil mentor dude came out with him. I ain't even shoot at him. I just made him run back in. By this time, Marley tossing him down. | The Youth Peace Center's video surveillance footage shows that Mack's mentor was at the door when the shooting began. As soon as the shooting commenced, Mack's mentor ran back inside the building. |
| I chase him. On Mike, as I'm chasing him, shorty, I brace up in the field—let off four, five shots. He never fell. On Mike, he never fell. So, I'm like—I don't think I hit him. You get what I'm saying? . . . He steady running, though. You feel what I'm saying? He hit, though. You can tell he hit, due to the fact, shorty. You | The Youth Peace Center's video surveillance footage shows that the shooter who got out of the driver's seat of Chrysler 300 pursued and continued to shoot at Mack as Mack fled eastbound in the direction of nearby train tracks. Mack eventually collapsed on the |

| | |
|---|---|
| know, you get to losing breath. You get to slowing down. On Mike, he got a distance on me. . . . On Mike, I'm on his ass. He fell. And he, on Mike, he try to go across the tracks. Fall, ni**a. He fall, you know? Ni**a be scared. He fumbling and getting up. He finally get up, on Mike. He running. On my dead niece, last time I see that ni**a's face, his eyeballs was this big, ni**a. I'm here, bitch. Come here. He fall. You know you ain't getting back up after—pow, pow, pow, pow, pow. Right over— pow, pow. Head shot. Come here. I'm gone. | other side of the train tracks. The shooter ran over to Mack and executed him. |

Further, as discussed above, minutes after the shooting, Powell called Montgomery-Wilson's phone. The calls went unanswered because Montgomery-Wilson's phone, which had his DNA on it, was left behind in the Chrysler 300 along with a coffee cup that had Powell's prints on it. Moreover, Montgomery-Wilson's statements about committing the murder to collect a payment from Individual A are corroborated by Montgomery-Wilson's text messages with Powell concerning collecting payment from "otf" on the 17th—the same day that Montgomery-Wilson was present at Individual A's podcast interview in Chicago—as well as the Facebook story that was uploaded to Montgomery-Wilson's Facebook account depicting Montgomery-Wilson counting out money while one of Individual A's songs played in the background.

The content and context of Montgomery-Wilson's recorded statements to his cellmate concerning his and Powell's involvement in Mack's murder, which is corroborated by a wealth of independent evidence, clearly demonstrate its trustworthiness for the purposes of admission under Rule 804(b)(3). *See, e.g.*, *Taylor*,

802 F. App'x at 608 (affirming admission of co-defendant's incriminating and inculpating statements to a cellmate, having found that the statements contained "particularized guarantees of trustworthiness" because "(1) [the co-defendant] inculpated himself as much (if not more) than [the defendant] in the murder; [the co-defendant] had no self-interested motive in confessing to the murder, other than perhaps to brag about his criminal past to increase his clout in prison; (3) [the co-defendant] was not coerced in confessing to the murder; and (4) [the co-defendant] was not attempting to curry favor with the Government when he confessed to his cellmate, who turned out to be a confidential informant."); *United States v. Dargan*, 738 F.3d 643, 649–50 (4th Cir. 2013) (co-defendant's statements to cellmate regarding their involvement in a robbery were admissible against defendant at trial under Rule 804(b)(3) where the "gist of the statements was confirmed by a wealth of independent evidence").

In granting Powell's severance motion, the Court found:

> [U]nder Federal Rule of Criminal Procedure 14, the unfair prejudice to Powell is far too great to allow him to be tried jointly with his co-defendant without the opportunity to cross-examine him. The nature and magnitude of a co-defendant statement implicating a co-defendant in a murder is obvious. There is no fair and reasonable way for the jury to hear the statement against the co-defendant and disregard it as to Powell.

Dkt. 128. Respectfully, it is the government's position that the jury should *not* disregard Montgomery-Wilson's statements as to Powell because those statements

20

are admissible against Powell. "Once the hearsay is deemed sufficiently reliable to qualify for the exception, it may be used for any purpose, including as substantive evidence of a co-defendant's guilt." *United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014).

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, the probative value of Montgomery-Wilson's statements incriminating both of them in the charged murder-for-hire offense substantially outweighs any danger of unfair prejudice.

The probative value of Montgomery-Wilson's recorded statements is substantial. Montgomery-Wilson's statements detailed not only how they murdered Mack but also why they did so, namely, to collect a cash payment for Mack's murder. "[I]f evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases." *United States v. Kapp*, 419 F.3d 666, 667 (7th Cir. 2005). In order to convict Powell of committing the murder-for-hire, the government must prove that Powell knowingly used or caused another to use a facility of interstate commerce and did so with the intent that a murder-for-hire be committed—that is, a murder in violation of the laws of any state as consideration for the receipt of, or a promise or agreement to pay, something of pecuniary value; in order to convict Powell of the conspiracy count, the government must prove that

Powell conspired with Montgomery-Wilson or others to commit the murder-for hire. *See United States v. Caguana*, 884 F.3d 681, 687 (7th Cir. 2018); *United States v. Dvorkin*, 799 F.3d 867, 875 (7th Cir. 2015). Given that Montgomery-Wilson's statements bear directly on elements of the charged offenses—the murder, the motive for committing the murder, and the agreement to commit the murder—the probative value of the statements is incredibly high. The statements also provide crucial context for the text messages that Powell and Montgomery-Wilson exchanged in the aftermath of Mack's murder about collecting a payment from "otf." *See United States v. Johnson*, 89 F.4th 997, 1004–08 (7th Cir. 2024) (reversing district court's exclusion of probative evidence under Rule 403 that, among other things, provided corroboration for other evidence in the case).

"[R]elevant evidence is, by its very nature, prejudicial, and that evidence must be unfairly prejudicial to be excluded. Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Denburg*, 212 F.3d 987, 994 (7th Cir. 2000) (quoting *United States v. Long*, 86 F.3d 81, 86 (7th Cir. 1996)); *see also United States v. Hamzeh*, 986 F.3d 1048, 1056 (7th Cir. 2021) ("We remind the court only exclusions of that evidence which violates Rule 403 should be made, and prejudice should be unfair to justify exclusion."). The admission of Montgomery-Wilson's statements would not be *unfairly* prejudicial, as those statements would not induce the jury to decide the case on an improper basis. Montgomery-Wilson's

statements constitute reliable, relevant, and highly probative evidence that Powell conspired with Montgomery-Wilson to kill Mack in order to collect a cash payment for his murder.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court admit Montgomery-Wilson statements at Powell's trial.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: JARED JODREY
JASON JULIEN
Assistant United States Attorneys
United States Attorney's Office
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
312-353-5358