UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 23 CR 546-2 |
| v. ) | |
| ) | Judge Thomas M. Durkin |
| PRESTON POWELL, ) | |
| also known as "Marley" ) | |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS
MOTION TO ADMIT CO-DEFENDANT STATEMENTS**

**I.  INTRODUCTION**

The government previously moved for use of the entirety of co-defendant Anthony Montgomery-Wilson's recorded statements against defendant Preston Powell under Federal Rule of Evidence 804(b)(3)'s hearsay exception as statements against the declarant's interests. The government recognizes that the Court decided to sever defendants' trial out of a concern that statements implicating Powell would be unduly prejudicial because Powell would not be able to confront and cross-examine Montgomery-Wilson about those statements.

By way of this submission, the government proposes that the Court allow for the admission of three limited excerpts from Montgomery-Wilson's recorded statements to the CS that do not implicate Powell and, instead, bear only upon Montgomery-Wilson's pecuniary motive for participating in Stephon Mack's murder. These portions do not reference Powell or his nickname ("Marley"), mention the involvement of a second shooter, or discuss the details of the shooting. Instead, these

1

excerpts simply show that Montgomery-Wilson's motivation for killing Mack was to collect a cash bounty that had been put out for Mack's murder by Individual A and his associates with OTF (the music label "Only the Family"). Excluding these limited excerpts would deprive the jury of critical context necessary for understanding other evidence in the case concerning the motive for Mack's murder. This is especially true here considering the nature of the charged murder-for-hire conspiracy, which did not involve an explicit and individualized agreement between Individual A and the shooters, but related to a general bounty put out to willing assassins.

The three excerpts that the government now seeks to admit against Powell are reflected below:

| **Excerpt #1: In this excerpt, Montgomery-Wilson explained to the CS that the bounty for killing "Youngin'," which was Mack's nickname, was $70,000 and that Montgomery-Wilson tried to get the amount increased to $90,000.** ||
|---|---|
| MONTGOMERY-WILSON | Next thing you know, that's a dub. Reminds me, we was having a conversation, shorty. Kenken told me, like, "Shit, he a seventy ball [$70,000] right now." You know what I'm sayin'? I'm finna try to get him to go to a ninety [$90,000]. We trying to get ninety [$90,000] out of 'em for this shit. |
| CS | For a motherfucker. |
| MONTGOMERY-WILSON | For Youngin' [the Mack murder]. |

2

| **Excerpt #2: In this excerpt, Montgomery-Wilson explained to the CS that although Individual A contributed $50,000 to the bounty for killing Mack, Montgomery-Wilson only collected a portion of those funds.** ||
|---|---|
| MONTGOMERY-WILSON | Look. Jam—this what Jam told Deedee. I mean, he told Bondo, like, Bug he say man [Individual A] gave up fifty [$50,000], shorty. He only pay me a dub, so that's—it's thirty [$30,000] missing. Remind you, I'm locked up. |

| **Excerpt #3: In this excerpt, Montgomery-Wilson explained to the CS that he received approximately $40,000 for killing Mack.** ||
|---|---|
| CHS | So, all together, you got thirty-five [$35,000]? |
| MONTGOMERY-WILSON | Thirty-five [$35,000] and then another five [$5,000] from JD and them, which they supposed to gave me a hundred [$100,000], shorty. They really owe me a hundred [$100,000]. |

These three limited excerpts exclusively concern Montgomery-Wilson's admissions to the CS that he killed Mack to collect a payment that had been offered by Individual A and his associates for the murder. The statements were clearly against Montgomery-Wilson's interests and are independently corroborated by other evidence. These three limited excerpts are highly probative of the "for-hire" component of Mack's murder, and their admission would not be unfairly prejudicial to Powell.

Given the nature of its alternative proposal, the government does not object to the Court permitting Powell to file a sur-reply on this issue. Moreover, considering the importance of this evidentiary dispute to the case, the government would welcome

3

a short oral argument on this matter, to the extent that it would be helpful to the Court.

## II.     ARGUMENT

### A. Montgomery-Wilson's Incriminating Statements Relating to His Receipt and Attempted Receipt of Funds in Connection with the Mack Murder Constitute Highly Probative Evidence in Powell's Trial.

Montgomery-Wilson and Powell are charged with (1) conspiracy to commit murder-for-hire, in violation of Title 18, United States Code, Section 1958(a) (Count One); and (2) murder-for-hire, in violation of Title 18, United States Code, Sections 1958(a) and 2 (Count Two). Montgomery-Wilson is also separately charged with unlawful possession of a firearm as a felon, in violation of Title 18, United States Code, Section 922(g)(1) (Count Three).

In order to prove Count Two, the government must prove beyond a reasonable doubt that: (1) the defendant knowingly used or caused another to use a facility of interstate commerce; and (2) the defendant did so with the intent that a murder-for-hire be committed—that is, a murder in violation of the laws of any state as consideration for the receipt of, or a promise or agreement to pay, something of pecuniary value. *See United States v. Caguana*, 884 F.3d 681, 687 (7th Cir. 2018); *United States v. Dvorkin*, 799 F.3d 867, 875 (7th Cir. 2015). For Count One, the government must prove an agreement by Montgomery-Wilson and Powell to participate in a murder-for-hire.

4

The three excerpts identified above concerning Montgomery-Wilson's motive for murdering Mack were clearly against Montgomery-Wilson's interests. *See, e.g., United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) ("[T]he context in which Mr. Hamilton made his extrajudicial statements has been recognized by the advisory committee as one that passes Rule 804(b)(3) muster. This is not a case in which Mr. Hamilton made his statements to gain favor with law enforcement officials; rather, he made them to a cellmate with whom he was on friendly terms, and with whom he discussed his legal strategy at length."); *see also United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014) ("Once the hearsay is deemed sufficiently reliable to qualify for the exception, it may be used for any purpose, including as substantive evidence of a co-defendant's guilt.").

Moreover, Montgomery-Wilson's statements about committing the murder to collect a payment from Individual A and his associates are supported by "corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it," Fed. R. Evid. 804(b)(3), including: (i) Montgomery-Wilson's text messages with Powell about collecting payment from Individual A on February 17, 2022; (ii) Montgomery-Wilson's presence at Individual A's podcast interview in Chicago on February 17, 2022; and (iii) the Facebook story that was uploaded to Montgomery-Wilson's Facebook account depicting Montgomery-Wilson

5

counting money while one of Individual A's songs played in the background. *See* Exhibits 7, 8, and 9 to R. 139.

The three excerpts constitute highly probative evidence, the exclusion of which will prejudice the government in its ability to meet its burden. The excerpts concern Montgomery-Wilson's motive for killing Mack and, in turn, bear directly upon a critical element of the charged offenses, namely, that Mack was murdered as consideration for the receipt of, or a promise or agreement to pay, something of pecuniary value. *See United States v. Kapp*, 419 F.3d 666, 667 (7th Cir. 2005) ("[I]f evidence is probative of an issue relevant to an element of the offense, it must be admitted in all but the most extreme cases."); *see also, e.g.*, *United States v. Westmoreland*, 240 F.3d 618, 627 (7th Cir. 2001) (finding that co-conspirator's statements "merely fill in gaps in his story and reveal [co-conspirator's] detailed knowledge of the drug conspiracy, in which he played a major role," and that certain of those statements, including jailhouse confessions to a cellmate, were admissible under Federal Rule of Evidence 804(b)(3)).

The government bears the burden of proving the "for-hire" element of the charged offenses beyond a reasonable doubt, and the three limited excerpts from the CS's recording provide necessary context for the jury to understand the true import of Powell's text message exchange with Montgomery-Wilson about colleting a payment of money from Individual A and his associates following Mack's murder. The exclusion of Montgomery-Wilson's statements would create "[g]aps in the

6

government's narrative" about the "for hire" component of the murder-for-hire charges. *United States v. Johnson*, 89 F.4th 997, 1005, 1006 (7th Cir. 2025) ("Gaps in the government's narrative risk the jury drawing an unfair negative inference against the government. This can be a significant risk when the government bears the burden of persuasion beyond a reasonable doubt.") (internal citations omitted). That is especially true in a case like this where there was not a direct communication between the individual soliciting the murder (Individual A) and the murderers (Montgomery-Wilson and Powell). Rather, as the evidence will show, Individual A effectively put out a bounty for Mack's murder, which Montgomery-Wilson admitted to being the motivating factor for the murder. As set forth below, those admissions, when combined with Powell's text message exchange with Montgomery-Wilson, constitutes critical evidence of the "for-hire" component of the charges.

At Powell's trial, the government would use the three limited excerpts from Montgomery-Wilson's recorded conversation with the CS to establish Montgomery-Wilson's "for hire" motive for participating in Mack's murder. Separately, the government would introduce, among other things, video evidence, forensic evidence, historical cell-site location evidence, and phone record evidence to prove that Powell participated in Mack's murder. The government would then introduce Powell's text message communications with Montgomery-Wilson to establish that Powell sought to collect a payment from Individual A and his associates shortly after the murder.

7

The three limited excerpts from Montgomery-Wilson's recorded statements to the CS provide critical context for those text messages. As discussed above, in the first excerpt, Montgomery-Wilson explained to the CS that the bounty for killing Youngin' (Mack), was $70,000 and that Montgomery-Wilson tried to get the amount increased to $90,000; in the second excerpt, Montgomery-Wilson explained to the CS that Individual A contributed $50,000 to the Mack murder bounty ("[Individual A] gave up fifty [$50,000], shorty"); and in the third excerpt, Montgomery-Wilson explained to the CS that he collected a portion of the payment for killing Mack, but believed that he was owed additional money. That evidence provides necessary context for text communications between Powell and Montgomery-Wilson that occurred two weeks after Mack's murder. In those communications, Powell and Montgomery-Wilson had the following exchange:

| POWELL: | Wassup with otf [Only the Family] |
| MONTGOMERY-WILSON: | Nothing |
| POWELL: | Wym they not payin |
| MONTGOMERY-WILSON: | We waiting he comes up here on the 17th |
| POWELL: | Ight |

*See* Exhibit 7 to R. 139. On February 17, 2022, Individual A was in Chicago conducting a podcast interview, which Montgomery-Wilson attended. That day, Powell texted Montgomery-Wilson: "Stand on that why u with [Individual A] nem." The following day, Powell texted Montgomery-Wilson: "Did [Individual A] gave u that money."

8

Without the context of Montgomery-Wilson's recorded statements regarding the role that Individual A and his associates had in Mack's murder, the jury will lack the necessary context for understanding Powell's text message exchanges with Montgomery-Wilson about collecting the payment from them.

    **B.    Montgomery-Wilson's Incriminating Statements Relating to His Receipt and Attempted Receipt of Funds in Connection with the Mack Murder Do Not Unfairly Prejudice Powell.**

The three limited excerpts from Montgomery-Wilson's recorded statements that the government seeks to admit at Powell's trial do not reference Powell (or even his nickname, "Marley"), the involvement of a second shooter, or the details of the shooting. Admission of these limited excerpts, which exclusively incriminate Montgomery-Wilson, would not pose a danger of unfair prejudice to Powell. As set forth above, the government will, through the use of independent evidence, connect Powell to Mack's murder and prove his knowing involvement in the murder-for-hire conspiracy through witness testimony and text messages that Powell exchanged with Montgomery-Wilson. The probative value of the excerpted recorded statements is substantial, and Powell cannot demonstrate that their admission would be unfairly prejudicial.

### III. CONCLUSION

For the foregoing reasons, as well as those set forth in its initial motion, the government respectfully requests that the Court admit the entirety of Montgomery-Wilson's incriminating statements at Powell's trial. In the alternative, the government respectfully requests that the Court admit the three above-discussed limited excerpts from Montgomery-Wilson's recorded statements that bear upon Montgomery-Wilson's motive for participating in Mack's murder.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: _____
JARED JODREY
RICHARD M. ROTHBLATT
Assistant United States Attorneys
United States Attorney's Office
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
312-353-5358

10